# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

STEVE HUTCHINSON,　　　　　　　　　　Case No. 1:18-cv-761
　　　Plaintiff,　　　　　　　　　　　　　Cole, J.
　　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.
　　　vs.

COMMISSIONER OF　　　　　　　　**REPORT AND**
SOCIAL SECURITY,　　　　　　　　　**RECOMMENDATION**
　　　Defendant.

Plaintiff Steve Hutchinson brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and

supplemental security income (SSI).  This matter is before the Court on plaintiff's Statement of

Errors (Doc. 14), the Commissioner's response in opposition (Doc. 19), and plaintiff's reply

(Doc. 20).

## I.  Procedural Background

Plaintiff filed his applications for DIB and SSI in June 2015, alleging disability since

November 9, 2012, due to herniated discs, "deaf" in left ear, vision problems and lazy eye,

obesity, nerve problems in neck, arms, back, and legs, high blood pressure, depression, Attention

Deficit Hyperactivity Disorder (ADHD), and chronic bronchitis.  The applications were denied

initially and upon reconsideration.  Plaintiff, through counsel, requested and was granted a *de*

*novo* hearing before administrative law judge (ALJ) Christopher S. Tindale.  Plaintiff and a

vocational expert (VE) appeared and testified at the ALJ hearing held on January 12, 2018.  On

June 25, 2018, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  This

decision became the final decision of the Commissioner when the Appeals Council denied review on September 19, 2018.

## II.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The [plaintiff] has not engaged in substantial gainful activity since November 9, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: degenerative disc disease of the lumbar spine; obesity; coronary artery disease; degenerative joint disease of the right knee; hearing impairment; major depressive disorder; anxiety disorder; post-traumatic stress disorder; organic mental disorder; and substance use disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: occasionally climb ramps and stairs,

stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; must avoid all exposure to dangerous hazards, such as unprotected heights and dangerous moving machinery; never work in very loud noise environments; limited to simple and routine, 1 to 3 step tasks in a work environment free of fast production rate or pace work; no contact with the public; occasional contact with supervisors; occasional and superficial contact with co-workers, with superficial contact defined as no tandem tasks; limited to occasional changes in the work setting and occasional decision making.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1980 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404 Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from November 9, 2012, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 23-37).

---

[1]Plaintiff's past relevant work was as a parts deliverer, a medium, unskilled position; a customer service representative, a light, semi-skilled position that plaintiff performed at the heavy exertion level; and a sales representative, a light, semi-skilled position.  (Tr. 34, 108-09).

[2]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as an inspector (147,000 jobs in the national economy), a sorter (100,000 jobs in the national economy); and a weights measure checker clerk (45,000 jobs in the national economy).  (Tr. 36, 110).  The ALJ also found that plaintiff would be able to perform the requirements of representative unskilled sedentary occupations such as "labor freight stock" (47,000 jobs in the national economy); inspection tester (38,000 jobs in the national economy); and coupon counter/scanner (71,000 jobs in the national economy).  (Tr. 36, 111).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

5

**D. Relevant Medical Evidence**

　　1. Robert Sorscher, M.D./Crossroads Center

Plaintiff was seen by a social worker for an initial assessment at The Crossroads Center (Crossroads) on March 6, 2015.  (Tr. 869-92; *see also* Tr. 1792-1815 (duplicate pages)). Plaintiff had been incarcerated for two "AOD" (Alcohol and Other Drug) related theft offenses and was mandated to complete residential treatment.  (Tr. 875).  Plaintiff had completed a 90-day stay at Turning Point on January 29, 2015 and was to undergo 26 weeks of aftercare for substance abuse and addiction.  (Tr. 869).  Plaintiff had been referred to Crossroads for treatment with the medication Suboxone.  (*Id*.).  Plaintiff complained of intense cravings and being "stressed out about remaining sober."  He reported he had been "clean" from opiates from September until the prior Monday, March 2, 2015, which he described as an isolated incident which resulted from continued cravings for heroin and to spending time with someone with whom he had a history of "using."  Plaintiff was motivated to remaining "clean" and agreed with a plan to become stabilized on, and tapered off, Suboxone.  Plaintiff stated that before his incarceration, he had used heroin daily for the preceding 18 months.  He reported he had no periods of sustained sobriety between the time he had begun using opiates five years earlier and his incarceration/"Turning Point Treatment."  Plaintiff denied using any marijuana since going to jail in September.  Plaintiff reported that he was active in AA/NA (Alcoholics Anonymous/Narcotics Anonymous) and attended three to four meeting per week; he had a sponsor; he had "made many contacts through the organization"; and he "was committed to move forward in a positive direction, but could use more help."  (*Id*.).

Plaintiff complained that he had been feeling anxious since becoming sober in September.  He was unable to fall and stay asleep, he felt "on edge" and uncomfortable in situations in which he used to be unaffected, and he felt stressed, worried, and lightheaded.  (*Id*.).  He sometimes had intense cravings that increased his anxiety and made him feel "dopesick."  He reported that his primary care physician had treated him for anxiety in December 2013, when "his primary complaint was needing assistance in managing life stress caused by the ending of an unhealthy romantic relationship."  He was prescribed 1 mg of Klonopin at that time, but he did not like how it made him feel and did not take the full month's prescription or pursue further medication options.  Plaintiff reported that the "feelings abated when the situation stabilized." (*Id*.).

Plaintiff's life goals were to achieve and maintain sobriety, be free from Suboxone, work full-time, live independently with his girlfriend, and become financially stable.  (Tr. 870). Plaintiff was determined, he felt positive about the situation, and he was committed to staying sober, but cravings for drugs, the stress of probation, and the lack of his own transportation were barriers to success.  (*Id*.).  Plaintiff reported he was working part-time as a cook and was interviewing to work as a server, and he had fines to pay off.  (Tr. 870, 877).  Plaintiff stated that his drug use had estranged him from positive people, and he was rebuilding a support network of family and people he was meeting through AA/NA.  (Tr. 870).  He had a shared-parenting agreement for custody of his daughter, with whom he spoke daily, and he had started attending church again with his girlfriend.  (*Id*.).

Plaintiff reported that he was "unable to maintain employment" when he was "using." (Tr. 871).  He reported that "anxiety and guilt is currently causing him to feel bad, but he can motivate."  (*Id*.).  He stated that sleep issues caused him to feel fatigued.  (*Id*.).

On mental status examination, plaintiff was cooperative; body movement, appearance, speech and thought content were within normal limits; mood and thought process were within normal range; he was oriented in all four spheres; he was alert; his intellectual functioning was normal; his insight was good; he had no suicidal ideation or plan to harm others; impulsivity risk was normal; and his relationship with significant others was "Present/Helpful (Low Risk)."  (Tr. 881-84).  Plaintiff's diagnosis was "AOD Dependent and/or Under the Influence (High Risk)." The only abnormalities noted were that plaintiff was anxious and his stress level was rated as moderate.  (Tr. 882-84).  The problems identified during the assessment were "symptoms of anxiety."  (Tr. 890).  The goals were for plaintiff to "learn effective coping skills for anxiety management and reduction" and to "comply with requirements to end probation successfully and avoid future legal involvements."  (*Id*.).  Plaintiff was assessed with clinical disorders of opioid dependence-unspecified; cocaine dependence-remission; and cannabis dependence-remission. (Tr. 887).  The treatment plan included assessment, individual and group counseling, drug screens, case management, and medical/somatic treatment.  (Tr. 890).

Plaintiff began a 90-day treatment plan and was first seen for individual counseling on March 9, 2015.  (Tr. 893-96).  Plaintiff's presenting problem was opiate addiction, and the goal was for him to participate in a recovery-based program to maintain his sobriety and "be able to get [his] normal life back."  (Tr. 893).  The treatment plan included medication and weekly

individual counseling. (Tr. 894). Dr. Sorscher signed off on the plan as the prescribing physician for plaintiff's treatment medication, Suboxone. (Tr. 895). The record includes treatment notes prepared by Dr. Sorscher from March 2015 to September 2017, which review plaintiff's conditions, medication efficacy, substance abuse, and health changes from visit to visit and assess plaintiff's progress related to his symptoms. (Tr. 2444-2500, 2758-2821, 2994-3012).

Dr. Sorscher completed a mental impairment questionnaire on April 20, 2017, indicating that he saw plaintiff monthly. (Tr. 2918). Dr. Sorscher diagnosed plaintiff with moderate major depressive disorder, severe opioid use disorder, and PTSD, deferred. He assigned plaintiff a current GAF score of "68," which was also his highest GAF score over the past year.[3] Treatment consisted of medically-assisted treatment (MAT) with Suboxone, individual therapy, and psychiatric services at Greater Cincinnati Behavioral Health Services (GCBH). Plaintiff was also prescribed Gabapentin, Topamax, Wellbutrin, and melatonin. Side effects were drowsiness and lethargy. The clinical findings that supported the evaluation were low motivation, sad mood, anxiety, and panic symptoms in public settings. Dr. Sorscher opined that plaintiff's prognosis was fair given that his depressive and anxiety symptoms persisted. (*Id.*).

Dr. Sorscher assessed plaintiff's degree of limitation in the different categories of mental functioning as "mild" to "severe." (Tr. 2919-20). For purposes of the assessment, "mild" to

---

[3] A GAF score represents a clinician's assessment of an individual's overall level of functioning on a scale of 0-100. Diagnostic & Statistical Manual of Mental Disorders, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). A score between 61 and 70 "indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Haygood v. Colvin*, No. 1:12CV0700, 2013 WL 1568548, at *2, n. 2 (N.D. Ohio Apr. 12, 2013) (citing DSM IV at 34). An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Carter v. Berryhill,* No. 1:16-CV-01840, 2017 WL 2544064, at *2, n.4 (N.D. Ohio May 26, 2017), *report and recommendation adopted,* 2017 WL 2537066 (N.D. Ohio June 12, 2017) (citing DSM V at 16) (American Psychiatric Ass'n, 5th ed., 2013)).

"moderately severe" meant "able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity)" for the following portions of the work day/work week: "no more than 10 percent of the work day or work week" ("mild"); "from 11 to 20 percent of the work day or work week" ("moderate"); and "more than 20 percent of the work day or work week" ("moderately severe").  (Tr. 2919).  A "severe" limitation meant "not able to perform designated task or function on regular, reliable, and sustained schedule."  (*Id*.).  Dr. Sorscher assessed the following limitations:

- Understanding and memory: Moderate limitations in plaintiff's ability to remember locations and work-like procedures; understand and remember very short and simple instructions; and understand and remember detailed instructions.

- Sustained concentration and persistence: Moderate limitations in his ability to carry out very short and simple instructions, and moderately-severe limitations in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

- Social interaction: Mild limitations in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; moderate limitations in the ability to ask simple questions or request assistance; moderately-severe limitations in the ability to accept instructions and respond appropriately to criticism from supervisors, and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and severe limitations in the ability to interact appropriately with the general public.

- Adaptation: Mild limitations in the ability to be aware of normal hazards and take appropriate precautions, and moderate limitations in the ability to respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (*Id*.).

(Tr. 2919-20).  Dr. Sorscher assessed the following functional limitations: moderate restriction of activities of daily living; moderately-severe difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of

10

decompensation, each of at least two weeks duration, within a 12-month period.  (Tr. 2920).  He opined that plaintiff would miss about four days of work per month, his impairment had lasted or was expected to last at least 12 months, and plaintiff's substance abuse did not contribute to his limitations.  (Tr. 2921).

### 2.  Shannon Weinstein CNP/Greater Cincinnati Behavioral Health

Plaintiff was initially assessed for mental health services at GCBH in April 2016.  (Tr. 2522-39).  Plaintiff reported symptoms of anger, aggression, nightmares, insomnia, poor appetite, isolation, worthlessness, low motivation, hypervigilance, racing thoughts, nervousness, anxiety, and panic attacks occurring four times per week.  (Tr. 2522).  On mental status examination, plaintiff exhibited restless behavior and a depressed mood.  (Tr. 2535).  The remainder of his mental status examination was normal.  He was diagnosed with opioid use disorder-severe/in remission and major depressive disorder-recurrent episode-moderate.  (Tr. 2538).

Plaintiff first saw Shannon Weinstein, CNP, at GCBH in October 2016.  (Tr. 2843-45).  He presented with symptoms of depression, anxiety and anger.  He described social anxiety and feeling hypervigilant when in public.  He reported he could not tolerate people standing behind him and he had a lot of nightmares, usually about his father.  Plaintiff also reported that he suffered from intense feelings of guilt about past behaviors and crimes, and he had always experienced difficulty maintaining relationships with friends.  (Tr. 2843).  On mental status examination, Ms. Weinstein found that plaintiff was alert and oriented times three; he was well-groomed and dressed appropriately; he made good eye contact; his speech was of a normal rate

and volume; he was pleasant, cooperative, and easily engaged; his mood and affect were depressed and he was tearful at times; he had anhedonia; he had low energy and a poor appetite; his judgment and insight were good; and his thought process was organized and goal-directed. He reported no audio/visual hallucinations and no suicidal or homicidal ideation.  He described his sleep as poor.  Ms. Weinstein diagnosed opioid use disorder, severe in remission; major depressive disorder - recurrent episode - moderate; and PTSD.  Prazosin for nightmares was prescribed, and Gabapentin for mood and anxiety and Wellbutrin were continued.  (Tr. 2844).

An Individualized Service Plan was developed for plaintiff at GCBH on October 5, 2016. (Tr. 2871-72).  The goals were to provide pharmacological management; CPST (Community Psychiatric Supportive Treatment) to "follow up with SSI" and assist plaintiff with increasing coping skills; continue counseling at Crossroads and eventually switch counselors; provide vocational services to assist plaintiff with obtaining employment; and for plaintiff to obtain stable, independent housing.  Plaintiff's goals for the future were to not feel so worthless and to try to make himself feel happier; find his own place to live; and be a better role model for his daughter.  (Tr. 2871).

Ms. Weinstein completed a mental impairment questionnaire on March 15, 2017.  (Tr. 2912-15).  She indicated she had seen plaintiff "about every 3 months for about 30-45 minutes." (Tr. 2912).  She listed his diagnoses as major depression with psychotic features and PTSD.  She reported that plaintiff received care management and was treated with neuroleptic medications. He was prescribed Gabapentin, melatonin, Wellbutrin, and Topamax, which she noted "could potentially cause dizziness and sedation."  Ms. Weinstein described the clinical findings as

12

plaintiff's complaints of "symptoms of depression and anxiety, very poor sleep, [and] recently

[plaintiff] has started to experience mild auditory and visual hallucinations." She described

plaintiff's prognosis as "moderate-severe." (*Id.*). She found plaintiff would have the following

limitations in the categories of mental functioning.

- Understanding and memory: Mild limitations in the ability to remember locations and work-like procedures, and in the ability to understand and remember very short and simple instructions; and moderate limitations in the ability to understand and remember detailed instructions.

- Sustained concentration and persistence: No limitations in his ability to carry out very short and simple instructions; mild limitations in his ability to carry out detailed instructions; and moderate limitations in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

- Social interaction: No limitations in his ability to ask simple questions or request assistance; moderate limitations in his ability to accept instructions and respond appropriately to criticism from supervisors; moderate limitations in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and moderately-severe limitations in his ability to interact appropriately with the general public and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

- Adaptation: Mild limitations in the ability to be aware of normal hazards and take appropriate precautions and in the ability to set realistic goals or make plans independently of others; and moderate limitations in the ability to respond appropriately to changes in the work setting and in the ability to travel in unfamiliar places or use public transportation.

(Tr. 2913-14). Ms. Weinstein assessed the following functional limitations: Moderate restriction

of activities of daily living; moderately-severe difficulties in maintaining social functioning;

moderate difficulties in maintaining concentration, persistence, or pace; and three episodes of

decompensation within a 12-month period, each of at least two weeks duration. (Tr. 2914). She

opined that plaintiff would miss more than four days of work per month, his impairment had

lasted or was expected to last at least 12 months, and plaintiff's substance abuse did not

contribute to his limitations.  (Tr. 2915).  She concluded by stating that plaintiff's "ability to be

out in public is greatly hindered by his mental illness.  Due to his PTSD he is very hypervigilant

when around other people and can become easily agitated.  Despite ongoing treatment he

continues to have high levels of depression and anxiety as well as mild psychotic symptoms

associated with PTSD."  (Tr. 2916).

### 3.  Jessica Twehues, Ph.D. – Consultative Psychologist

Consultative examining psychologist Dr. Twehues evaluated plaintiff for disability

purposes in November 2015.  (Tr. 1677-83).  Plaintiff reported that he was seeking disability due

to being unable to walk for a long period of time and being "really anxious all the time."  (Tr.

1677).  Plaintiff stated that he had shared custody of his 11-year old daughter but was currently

in a custody battle.  (Tr. 1678).  He reported that he experienced mood swings and was sad much

of the time; his energy was often limited and he was unmotivated; he had anger outbursts and

was easily distracted; he lost his temper frequently and recently had panic attacks in social

settings; he had significant difficulties with focus and distractibility; and he was impulsive.  He

denied suicidal thoughts, delusions, hallucinations, and paranoid thinking.  (Tr. 1679).

On mental status examination, plaintiff was pleasant, cooperative, alert, and responsive;

his hygiene was adequate; he was adequately motivated; his mood appeared mildly depressed

and his affect was appropriate; he "tended to speak somewhat rapidly," switched topic

frequently, and became tearful twice when talking about his experiences, but his speech was

clear and "100% understandable"; his receptive language skills were adequate; and his energy

14

appeared to be fair. (Tr. 1680-1681). He appeared able to focus well on the conversation, but he seemed restless and often fidgeted with papers in his hands. Plaintiff maintained adequate eye contact throughout the examination. His recent and remote recall seemed adequate, and he answered all math and recall questions correctly. He denied current suicidal and homicidal ideation. (*Id*.).

Dr. Twehues assessed plaintiff with major depressive disorder, moderate, recurrent; PTSD; opioid use disorder, severe, currently controlled with medication; cocaine use disorder, severe, sustained full remission; and ADHD, combined presentation, moderate. (Tr. 1682). Dr. Twehues opined that plaintiff was not expected to have difficulty understanding instructions for tasks; however, he may experience problems retaining information due to distractibility and problems with concentration due to some minor forgetfulness with regard to complex, multi-step tasks. Dr. Twehues felt plaintiff was limited in his ability to maintain attention to perform routine tasks due to symptoms of ADHD, which were likely to cause difficulties sustaining focus for prolonged periods of time. (*Id*.). His persistence on tasks was likely to deteriorate over extended periods of time and his impulsivity would cause him to be prone to making careless mistakes. Plaintiff would experience moderate interpersonal difficulty at work because he was likely to be prone to angry and agitated outbursts in response to criticism, and he "may misinterpret the benign actions of others as critical." (Tr. 1683). Dr. Twehues opined that plaintiff was likely to be prone to experiencing more frequent panic attacks in response to increased work demands and that "some everyday minor workplace pressures may heighten his anxiety and increase the probability of agitated or angry outbursts." She opined that he appeared

15

to have poor coping mechanisms and seemed to respond "impulsively to impaired judgment in response to stress." (*Id*.).

### 4. State Agency Review

State agency psychologist Marjorie Kukor, Ph.D., reviewed plaintiff's file in November 2015 and concluded that he was mildly restricted in activities of daily living; he experienced moderate difficulties in maintaining social functioning; he had moderate difficulties in maintaining concentration, persistence, or pace; and he had experienced no episodes of decompensation of extended duration. (Tr. 132). Dr. Kukor opined that plaintiff was capable of understanding and remembering 1-3 step tasks and that he would need reminders initially with more complex tasks. (Tr. 134). She opined that when symptoms are severe, plaintiff will need occasional flexibility in managing schedules and breaks and a reduction in production expectations. (Tr. 135). She opined that plaintiff can relate superficially with others, he can engage with the general public in brief interactions that do not involve problem-solving or resolving customer complaints, he would work best in independent settings, he could work with a small number of co-workers and would fare best in settings that do not require collaborative efforts for task completion, and he would need clear explanations when getting feedback from supervisors. (*Id*.). Dr. Kukor also found that plaintiff will need major changes previewed and gradually implemented to allow him time to adapt to new expectations, and he would need to have major goals and plans previewed prior to implementation. (Tr. 136). State agency psychologist Vicki Warren, Ph.D., reviewed plaintiff's file upon reconsideration in March 2016 and affirmed Dr. Kukor's assessment. (Tr. 169-76).

16

### E.  Specific Errors

On appeal, plaintiff alleges that the ALJ erred by: (1) improperly weighing the opinion evidence of record, and (2) engaging in a selective review of the evidence.  (Docs. 14, 20).

### 1.  Weight to the medical opinion evidence

Plaintiff alleges as his first assignment of error that the ALJ improperly weighed the opinion evidence provided by treating psychiatrist Dr. Sorscher, consultative examining psychologist Dr. Twehues, and certified nurse practitioner Weinstein.  (Doc. 14 at 8-12).

#### i.  Standard of review

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.  Medical opinions from treating sources are generally afforded more weight than those from non-treating sources since treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)[.]"  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997).  "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).

If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must weigh the factors specified in 20 C.F.R. §§ 404.1527(c) and 416.927(c) to decide what

17

weight to give the opinion; specifically, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Gayheart*, 710 F.3d at 376. *See also Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 (6th Cir. 2018) (citing *Wilson*, 378 F.3d at 544). The ALJ's decision "must contain specific reasons for the weight given to [a] treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5.[4] *See Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). This requirement serves two purposes: (1) "it helps a claimant to understand the disposition of [his] case, especially 'where a claimant knows that his physician has deemed him disabled,'" and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Shields*, 732 F. App'x at 438 (citing *Wilson*, 378 F.3d at 544). Remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion. . . ." *Id.* (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting in turn *Wilson*, 378 F.3d at 545).

Under the Social Security regulations, "a written report by a licensed physician [or psychologist] who has examined the claimant and who sets forth in his report his medical

---

[4] Effective March 27, 2017, SSR 96-2p was rescinded when the Social Security Administration published final rules that revised the rules and regulations applicable to the evaluation of medical evidence for claims filed on or after that date. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5844-45, 5869, 5880. *Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 n.9 (6th Cir. 2018). Since plaintiff's claim was filed prior to March 27, 2017, SSR 96-2p applies to this case

findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability proceeding. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson,* 402 U.S. at 402). In addition, the opinions of non-examining state agency medical and psychological consultants are weighed in accordance with the factors listed under 20 C.F.R. §§ 404.1527(c) and 416.927(c). The regulations provide that unless the ALJ gives a treating source's opinion controlling weight, the ALJ considers all of the factors under 20 C.F.R. §§ 404.1527(c)(1)-(6) and 416.927(c)(1)-(6) in deciding what weight to give to any medical opinion. 20 C.F.R. §§ 404.1527(e), 416.927(e).

The Commissioner must consider evidence from all "medical sources," SSR 06-03p, 2006 WL 2329939, *2, which refers to both "acceptable medical sources" and health care providers who are not "acceptable medical sources."[5] *Id*. (citing 20 C.F.R. §§ 404.1502, 416.902). Licensed physicians and licensed or certified psychologists are "acceptable medical sources." *Id*. (citing 20 C.F.R. §§ 404.1513(a)(1)(2), 416.913(a)(1)(2)).[6] A certified nurse practitioner is not an "acceptable medical source" and instead falls into the category of "other source."[7] 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). Only "acceptable medical sources" as defined under 20 C.F.R. §§ 404.1513(a) and 416.913(a) can provide evidence which establishes

---

[5] SSR 06-03p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

[6] Former §§ 404.1513 and 416.913 were in effect until March 27, 2017, and therefore apply to plaintiff's claim filed in 2015. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

[7] Plaintiff referred to Ms. Weinstein, a certified nurse practitioner, as a "treating provider" in his statement of errors. (Doc. 14 at 9). However, plaintiff acknowledges that under the applicable regulations in effect when he filed his claims, Ms. Weinstein is not an "acceptable medical source." (*Id*., n. 1; Doc. 20 at 2).

the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight.  SSR 06-03p, 2006 WL 2329939, at *2.  Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  *Id.*  Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment.  *Id*. at *4.  *See also Cruse v. Commissioner of Social Sec*., 502 F.3d 532, 541 (6th Cir. 2007).

   *ii.  The ALJ's evaluation of the medical source opinions*

   The ALJ assigned "little" weight" to the mental functional assessment of plaintiff's treating psychiatrist, Dr. Sorscher.  (Tr. 33).  The ALJ found that Dr. Sorscher's opinion was internally inconsistent.  The ALJ specifically found that while Dr. Sorscher assessed many moderate to severe limitations, the GAF score of "68" that he assessed indicated only mild mental limitations.  (*Id*.).  The ALJ further found that the "overly severe limitations" assessed by Dr. Sorscher were not supported by the record as a whole, as detailed by the ALJ in his written opinion.  (*Id*.).  In addition, the ALJ assigned "some weight" to the November 2015 assessment of consultative examining psychologist, Dr. Twehues.  (*Id*. at 32-33).  The ALJ discounted her opinion on the grounds that (1) Dr. Twehues interviewed plaintiff in a clinical setting but on only

one occasion; and (2) rather than assessing plaintiff's limitations in terms of the specific "B criteria" pursuant to her "specialty and programmatic knowledge," Dr. Twehues made only "vague conclusions about [plaintiff's] mental capacity." (*Id*.). The ALJ assigned "little" weight to Ms. Weinstein's assessment. (*Id*. at 33). The ALJ found that she was not an "acceptable medical source" as defined under 20 C.F.R. §§ 404.1502 and 416.902 because the record did not indicate that she was licensed in psychiatry or psychology. The ALJ further found that in any event, despite her treatment of plaintiff, her opinions were not consistent with the record as a whole because plaintiff admittedly "engaged in social interactions with the public without issue" as discussed in the ALJ's written opinion. (*Id*.). In addition, the ALJ found that Ms. Weinstein's contemporaneous treatment notes indicated only mild findings. (*Id*.). Finally, the ALJ gave "some weight" to the opinions of the state agency psychological consultants, who assessed mild to moderate functional limitations but found plaintiff retained the capacity to understand and remember 1 to 3 step tasks and relate superficially with others; he would work best independently; and he would need "occasional flexibility to manage his schedule and breaks." (Tr. 32). The ALJ found that the state agency reviewing psychologists "performed a thorough review of the available medical records and have a comprehensive understanding of agency rules and regulations," and they used the former "paragraph B" criteria in their assessment; their opinions were generally consistent with the record as a whole and in particular with plaintiff's "mostly unremarkable examination findings"; and the mental health evidence presented at the hearing level demonstrated that plaintiff would have "at least moderate limitations in all areas of mental functioning." (*Id*.).

21

### iii.  Plaintiff's arguments

Plaintiff argues that the substantial evidence of record is inconsistent with the weight the ALJ gave the opinions of Dr. Sorscher, Dr. Twenhues, and Ms. Weinstein.  (Doc. 14 at 9).  Plaintiff specifically alleges that the ALJ's evaluation of their opinions is inconsistent with the treatment notes of Dr. Sorscher, GCBH case management services, and Ms. Weinstein.  (*Id*. at 9-10).  Plaintiff cites to Dr. Sorscher's treatment notes which reflect that plaintiff suffered from persistent anxiety (Tr. 2454, 2457, 2463, 2794); variable sleep and nightmares (Tr. 2469, 2472, 2786, 2819); and issues with anger/irritability (Tr. 2771, 2788, 2817, 2819), while nevertheless maintaining sobriety (Tr. 2996).  (Doc. 14 at 9-10).  Plaintiff also alleges that the case management and treatment notes from GCBH similarly document persistent symptoms of anger, irritability, aggression, nightmares, insomnia, poor appetite, isolation, worthlessness, nervousness, anxiety, tearfulness, and panic attacks four times weekly.  (Doc. 14 at 10, citing Tr. 2522, 2861, 2859, 2857, 2879, 3041, 2867, 2857).  Plaintiff contends Ms. Weinstein likewise consistently reported symptoms and findings of depression, anger, tearfulness at times, poor appetite, depressed mood and affect, anhedonia, low energy, poor sleep, anxiety, infrequent auditory hallucinations, and more frequent visual hallucinations, and she adjusted plaintiff's medications to address his varying symptoms.  (Doc. 14 at 10, citing Tr. 2841-44, 2983-84, 2986-87, Tr. 2980-81).  Finally, plaintiff points to the psychological consultative exam of Dr. Twehues, who opined that plaintiff would likely have difficulties sustaining focus for prolonged periods of time; he was likely to experience panic attacks in crowds and be prone to angry and agitated outbursts in response to criticism; he would likely experience moderate interpersonal difficulty at work as a result; and even some everyday minor workplace pressures may heighten his

22

anxiety.  (Doc. 14 at 11, citing Tr. 1682-83).  Plaintiff argues the ALJ erred by discounting the opinions of Dr. Sorscher, Dr. Twehues, and Ms. Weinstein because their opinions are all consistent with each other.  (*Id*. at 11-12).

   *iv.  Resolution*

The ALJ did not err in evaluating the medical opinion evidence.  First, the ALJ's finding that Dr. Sorscher's opinion was entitled to "little" weight is substantially supported by Dr. Sorscher's treatment notes, the treatment notes of the other mental health sources, and other evidence of plaintiff's functional abilities.  As discussed below, the treatment records document plaintiff's ongoing complaints of mental health symptoms and some abnormal mental status examination findings.  The ALJ thoroughly considered this evidence together with other evidence showing many normal mental status examination findings, some improvement with medication, and plaintiff's participation in group activities.  The ALJ resolved the conflicts in the medical evidence, and substantial evidence supports the ALJ's finding that plaintiff's mental health symptoms were not as severe as Dr. Sorscher opined.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (ALJ has duty to resolve conflicts in medical evidence).

The ALJ acknowledged that plaintiff complained of persistent mental health symptoms during his treatment with Dr. Sorscher at Crossroads and at GCBH.  (Tr. 30-31, citing Tr. 869, 1792, 2457, 2522, 2538, 2794, 2843, 2905, 2986, 2987).  The ALJ found that plaintiff reported cravings for substances, social anxiety with tremors and sweating, anger outbursts, panic attacks four times weekly, nervousness, loss of interest, depression, poor appetite, isolation, low motivation, hopelessness, nightmares, and auditory and visual hallucinations.  (*Id*.).  The

treatment notes consistently documented anxiety. (Tr. 2463, 10/13/2015- "anxiety persists, does walking and meditation" and "added stress with brother," who was arrested on criminal charges; Tr. 2457, 11/20/2015- "describes anxiety around others - tremors, sweats"; Tr. 2522, 2538, 4/04/2016- current symptoms included social anxiety, hypervigilance, panic attacks about four times weekly; Tr. 2905, 4/18/2016- plaintiff complained of feeling nervous and disoriented when more than 5 to 6 people are around and having to sit with his back against a wall; Tr. 2794, 5/26/2016- "frustrated due to anxiety in large crowds" and "feels he cannot d[o] fast food due to social anxiety"; Tr. 2843, 10/10/2016- plaintiff complained of anxiety, social anxiety, and feeling hypervigilant when in public, and specifically having difficulty with people standing behind him; Tr. 2986-87, 4/24/2017- plaintiff was anxious). Further, the ALJ noted that at some GCBH treatment sessions and other examinations, plaintiff "appeared restless and fidgety" (Tr. 1676-84, 2535), and he "was tearful, seemed irritable, had rapid speech and was anxious" (Tr. 2879, 3017, 3041, 3049). (Tr. 31-32).

However, the ALJ also cited substantial evidence in the treatment records to support his finding that plaintiff's symptoms imposed no more than moderate limitations. (Tr. 31, citing Tr. 2475, 2758, 2773, 2841, 2980). In August 2015, plaintiff reported that his anxiety persisted despite Gabapentin, but he was "doing well," he had fewer nightmares, Suboxone was "working well" and he had "decreased cravings," he spent time with his roommates and girlfriend, and he would go to court soon for custody of his child. (Tr. 2475). Later that month, plaintiff reported less anxiety with Gabapentin, and he reported he would have more visits with his child after a court proceeding, which went well. (Tr. 2472). He also denied side effects and cravings. (*Id.*).

Plaintiff reported in September 2015 that sleep "is variable" with "some middle insomnia," but "trazadone is helpful." (Tr. 2469). In October 2015, plaintiff reported that he walked and meditated to alleviate his anxiety. (Tr. 2463). Plaintiff reported in December 2015 that though his social anxiety persisted, he was "doing well," he "was able to eat during rush hour," he planned to move in with his father, he had a good relationship with his girlfriend, he was seeing his daughter every other weekend and had a closer relationship with her, and he enjoyed playing rock guitar and watching movies. (Tr. 2454). In May 2016, plaintiff reported that he felt anxious in large crowds and was "stymied by efforts to pursue vocational work," but he reported his sleep was stable. (Tr. 2794). In July 2016, plaintiff reportedly had been in a physical altercation but he was pursuing vocational training; he found his caseworker at GCBH to be helpful; he had been told by GCBH that he may be able to avoid jail for failure to pay child support so long as he was working hard to get a job; his sleep was stable; and he reported he had occasional cravings for illicit drugs but will "take walks and play guitar as well as swim at parents [sic] pool." (Tr. 2788). In August 2016, plaintiff reported he was doing well; his sleep was good; he had found a way to increase his income by selling streaming devices and that helped occupy his time; and he was feeling better, less distressed, more "leveled out," and generally happier. (Tr. 2773). Plaintiff reported in September 2016 that the "court has validated [his] efforts to find work," and despite complaints of irritability and extreme mood swings, he felt his "coping skills and gabapentin/antidepressant has been helpful," he reported he "goes to family dollar and Cincinnati Zoo," and he reported he had a "good relationship" with Ms. Middleton, a counselor at Crossroads (Tr. 2771). In November 2016, plaintiff reported that

25

"gabapentin is helpful" for his anxiety around others.  (Tr. 2457).  Plaintiff reported in December

2016 that he was "doing better - more ups than downs," he had a good relationship with his case

manager at GCBH, he was seeking vocational training, he was driving since his license had been

reinstated, and he had a good relationship with his girlfriend.  (Tr. 2758).  Plaintiff and Dr.

Sorscher discussed coping skills, triggers and ways to avoid them, stressors and relaxation

techniques, exercises, proper diet, good sleep hygiene, and medication adjustments.  (Tr. 2758).

In addition, mental status exam findings made in December 2016 were largely normal.

Plaintiff's mood was depressed and anxious at times and his energy was "hit and miss," but

plaintiff was alert and oriented times three; no abnormal movements were noted; he was well-

groomed and dressed appropriately; his eye contact was good; speech rate and volume were

normal; affect was congruent; his thought process was organized and goal-directed; he reported

no auditory or visual hallucinations; he was sleeping well; and judgment and insight were good.

(Tr. 2841).  At GCBH in September 2017, after two deaths in his family, plaintiff complained

that he did not believe he had a depression problem but felt he had "a people problem."  (Tr.

2980).  Plaintiff had relapsed and was using marijuana and amphetamines at that time, and his

mood was "depressed, anxious, angry, anhedonic" and tearful.  (Tr. 2980-81).  However,

plaintiff felt that gabapentin was helping to control his anxiety.  (Tr. 2980).  On mental status

examination, he was oriented times three; no abnormal movements were noted; he was well-

groomed and dressed appropriately; eye contact was good; speech rate and volume were normal;

his thought process was organized and goal-directed; he reported no hallucinations and no

homicidal or suicidal ideation; he was sleeping well; and judgment and insight were good.  (Tr. 2981).

Though the record documents persistent mental health symptoms, the ALJ cited substantial evidence in the treatment records to support his finding that plaintiff's symptoms did not impose debilitating limitations.  Additional evidence of plaintiff's mental functioning supports the ALJ's finding that contrary to the medical source assessments, plaintiff had no more than moderate mental limitations.  (Tr. 31-32).  The ALJ relied on evidence that showed despite his complaints of anger, irritability, and panic attacks in public, plaintiff did not have issues when he presented to emergency rooms and consultative exams and was "polite and cooperative" during his interactions with medical personnel.  (Tr. 31).  His appearance, body movements, behavior, speech, and mood were reportedly normal during these interactions.  (*Id*., citing Tr. 1804-05, 3029).  In addition, the ALJ found that according to the treatment notes and plaintiff's own report, plaintiff was able to provide information about his health and his prior work history, follow instructions from healthcare providers, comply with treatment, answer medical providers' questions, and perform other activities which would require "some understanding, remembering, applying information, concentration, persistence, and pace."  (*Id*., citing Tr. 384-92 (Adult Function Report), Tr. 2853-2910 (GCBH treatment notes), Tr. 2993-3013 (Dr. Sorscher's treatment notes)).  Specifically, plaintiff reported that he attended AA/NA meetings, provided some care for his daughter and his girlfriend's foster children, performed household chores, drove, shopped, worked odd jobs, read, visited the library, and played video and card games.  (*Id*.).  The ALJ reasonably considered plaintiff ability to perform household and other activities

27

in evaluating plaintiff's assertions of debilitating symptoms.  *Keeton v. Commr. of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014).  *See also Gilbert v. Comm'r of Soc. Sec.*, No. 2:13-cv-00355, 2014 WL 4659858, at *3 (S.D. Ohio Sept. 17, 2014) (evidence of the plaintiff's daily activities, "including being able to get along with people in social settings, is inconsistent with the conclusion that Plaintiff was someone suffering from a 'disabling mental impairment'").  In particular, evidence of plaintiff's ability to function well in public settings substantially supports the ALJ's finding that the medical sources' assessments of plaintiff's mental functioning were entitled to only "little" or "some" weight.

Plaintiff nonetheless argues that the ALJ erred by rejecting the opinions of Dr. Sorscher, Dr. Twehues and Ms. Weinstein because their opinions were "[o]verall" consistent, and each of these opinions was entitled to "major weight."  (Doc. 14 at 12).  Plaintiff alleges that Dr. Sorscher found that plaintiff's depressive and anxiety symptoms persisted, while Ms. Weinstein found that plaintiff had high levels of depression and anxiety.  (*Id*. at 11, citing Tr. 2918, 2916).  Further, plaintiff notes that all three mental health sources found that plaintiff would have interpersonal difficulties on the job.  (*Id*. at 11).  Both Dr. Sorscher and Ms. Weinstein found that plaintiff had a moderately-severe limitation in his ability to get along with coworkers/peers without distracting them or exhibiting behavioral extremes and in his ability to maintain social functioning.  (*Id*., citing Tr. 2914, 2920).  Dr. Twehues found that plaintiff was likely to experience panic attacks in crowds, to be prone to angry and agitated outbursts in response to criticism, that even some minor everyday workplace pressures may heighten his anxiety, and he was likely to have moderate interpersonal difficulty at work as a result.  (Tr. 1683).  Plaintiff

28

alleges that both Dr. Sorscher and Dr. Twehues found that he would have limitations in his ability to maintain attention and concentration for extended periods of time, with Dr. Sorscher finding "moderately-severe" limitations (Tr. 2919) and Dr. Twehues opining plaintiff would "likely have difficulties" sustaining focus (Tr. 1682).  (Doc. 14 at 11).  Finally, plaintiff notes that both Dr. Sorscher and Ms. Weinsten opined that plaintiff would miss at least four days of work per month.  (*Id.*, citing Tr. 2921, 2915).

The ALJ did not err by discounting the opinions of Dr. Sorscher, Ms. Weinstein, and Dr. Twehues on this ground.  The ALJ complied with the applicable regulations by considering Ms. Weinstein's opinion and providing valid reasons for giving it "little" weight.  The ALJ found that she was not an "acceptable medical source" as defined under 20 C.F.R.§§ 404.1502 and 416.902. (Tr. 33).  The ALJ also found that in any event, her opinions were not consistent with the record as a whole because plaintiff admittedly "engaged in social interactions with the public without issue," and her contemporaneous treatment notes indicated only mild findings.  (*Id.*).  The ALJ discussed the mental status findings and other evidence of record that supports his finding that Ms. Weinstein's opinion was entitled to "little" weight.  (Tr. 30-32).  The ALJ's evaluation of Ms. Weinstein's opinion is consistent with the evidence discussed *supra*, and the ALJ's finding is substantially supported.  The ALJ did not err by declining to credit Ms. Weinstein's opinion or any other medical opinion based on its alleged consistency with Ms. Weinstein's opinion.

The ALJ likewise gave valid reasons for discounting Dr. Twehues' opinion.  The ALJ found that Dr. Twehues' opinion was entitled to only "some" weight based on the infrequency of examination and the "vague" nature of her conclusions.  (Tr. 32-33).  Plaintiff alleges that

the ALJ "[un]fairly" discounted the opinion of Dr. Twehues, who saw plaintiff once, based on the frequency of examination without taking this factor into account when evaluating the assessments of the state agency physicians, who never saw plaintiff. (Doc. 14 at 12, citing Tr. 33). But the ALJ was not bound to adopt Dr. Twehues' assessment over that of the state agency psychological consultants simply because she had examined plaintiff once. *See Harrold v. Colvin*, 1:14-CV-83, 2015 WL 5022086, at *7 (E.D. Tenn. Aug. 24, 2015) (citing SSR 96-6p, 1996 WL 374180 (1996) ("in appropriate circumstances, 'opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources," such as when the "reviewing source has broader access to the claimant's records.").

Further, the ALJ did not err by rejecting Dr. Twehues' assessment based on the vague nature of her conclusions. Dr. Twehues did not assess specific limitations. Dr. Twehues opined that plaintiff was "not expected to have difficulty understanding instructions" for job tasks, but he "may experience problems with retention of information" and "problems with concentration" with respect to complex multi-step tasks due to "some minor forgetfulness." (Tr. 1682). Dr. Twehues found that plaintiff was "likely to have difficulties sustaining focus for prolonged periods of time due to symptoms of ADHD"; "his persistence on tasks was likely to deteriorate over extended periods of time"; he would "be prone to making careless mistakes"; he was "likely to be distracted by intense anxiety" around groups of people and in crowds; he "may be prone to higher rates of absenteeism during depressive episodes due to reduced motivation"; he was "likely to experience panic attacks"; he was "likely to be prone to angry and agitated outbursts in

30

response to criticism and to experience moderate interpersonal difficulty at work as a result"; "he may misinterpret the benign actions of others as critical"; "he is likely to be prone to experiencing more frequent panic attacks in response to increased work demands"; and "[e]ven some everyday minor workplace pressures may heighten his anxiety and increase the probability of agitated or angry outbursts."  (Tr. 1682-83).  The ALJ reasonably found that Dr. Twehues' assessment was vague and was entitled to only "some" weight on this basis.  The ALJ did not err by giving greater weight to Dr. Twehues' opinion, or by failing to credit the assessments of Dr. Sorscher and Ms. Weinstein based on Dr. Twehues' allegedly consistent opinion.

Finally, plaintiff contends that the ALJ did not reasonably find that Dr. Sorscher's opinion was "internally inconsistent" based on the discrepancy between the GAF score Dr. Sorscher assessed and the degree of limitation Dr. Sorscher found.  (Doc. 20 at 1-2).  Plaintiff notes that the ALJ gave "little" weight to the GAF scores in the record as a whole, which ranged from "40" to "68," because the ALJ found that GAF scores are only a "snapshot" of an individual's functioning and are of limited use in assessing the severity of a mental impairment. (*Id*. at 2, citing Tr. 34).  Plaintiff suggests that the ALJ should have adopted the moderately-severe limitations Dr. Sorscher assessed, which plaintiff claims are consistent with his overall functioning on a continuing basis, and the ALJ should have disregarded the GAF score of "68" consistent with the ALJ's reasoning.  (Doc. 20 at 2).

The ALJ discounted the value of the GAF scores in the record because he found they represent "a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time, much like a snapshot," and they "do not

provide a reliable longitudinal picture of the claimant's mental functioning. . . ."  (Tr. 34, citing Tr. 2910, 2917-22).  It was not error for the ALJ to reject the GAF scores for this reason.  *See White v. Colvin*, No. 3:13-cv-171, 2014 WL 2813310, at *10 (S.D. Ohio June 23, 2014), *report and recommendation adopted,* 2014 WL 3510298 (S.D. Ohio July 14, 2014) (quoting *Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007) (internal citations and punctuation omitted) ("the Commissioner 'has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings. . . .  The GAF scores [] are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.")).  But neither did the ALJ err by discounting Dr. Sorscher's opinion based on the GAF score he assigned.  The ALJ did not consider whether the GAF score of "68" that Dr. Sorscher assigned was an indication of "nondisability" for Social Security purposes.  *See White*, 2014 WL 3510298, at *10.  The ALJ found only that there was an apparent inconsistency between the GAF score, which indicated mild symptoms, and the debilitating mental limitations Dr. Sorscher assessed in the same evaluation for the same time period.  The ALJ was entitled to give Dr. Sorscher's opinion discounted weight based on this internal inconsistency in his assessment.

The ALJ did not err in evaluating the medical opinion evidence.  The ALJ gave valid reasons for the weight he gave the opinions of Dr. Sorscher, Dr. Twehues, and Ms. Weinstein.  Those reasons are substantially supported by the evidence.  Plaintiff's first assignment of error should be overruled.

2.      **The ALJ's review of the evidence**

For his second assignment of error, plaintiff alleges that the ALJ erred by engaging in a selective review of the evidence of record.  Plaintiff contends that the ALJ incorporated into his written decision only medical findings that support the decision while "ignoring evidence that supports [plaintiff's] disabling impairments."  (Doc. 14 at 12).  Plaintiff notes that the ALJ cited several records to show that plaintiff reported that "medication and therapy were working well to control his symptoms," but several records support a contrary finding.  (*Id*. at 13).  Plaintiff also alleges that the ALJ cited some records to support his finding that plaintiff had a moderate limitation in the area of interacting with others, but plaintiff contends other records show instances of rapid speech, depressed mood, isolating behavior, and anxiety around others.  (*Id*.).  Plaintiff alleges that rather than considering the record as a whole, the ALJ "selectively chose the evidence that best supported his position that Plaintiff was not disabled."  (*Id*. at 13-14).

The Commissioner's decision cannot be upheld if the ALJ relied on a "selective review" of the record to justify his decision.  *Howard v. Barnhart*, 376 F.3d 551, 554 (6th Cir. 2004) (decision not substantially justified where ALJ relied on selective review of the record); *Castello v. Commr. of Soc. Sec.*, No. 5:09 CV 2569, 2011 WL 610590, at *5 (N.D. Ohio Jan. 10, 2011), *report and recommendation adopted sub nom. Castello ex rel. Castello v. Commr. of Soc. Sec.*, 2011 WL 610138 (N.D. Ohio Feb. 10, 2011) (where ALJ disregards and engages in a selective review of the record evidence, the decision lacks substantial support)).  "[I]f there is conflicting evidence which is material to the outcome of the case, but the ALJ fails to resolve it, the denial

of benefits is not substantially justified." *McClellan v. Commr. of Soc. Sec.*, No. 2:10-CV-118,

2012 WL 7822215, at *3 (E.D. Tenn. Jan. 26, 2012), *report and recommendation adopted sub*

*nom. McClellan v. Astrue*, 2013 WL 1292667 (E.D. Tenn. Mar. 28, 2013) (citing *Howard*, 376

F.3d at 554).  However, the ALJ does not improperly engage in a selective review of the

evidence merely by resolving inconsistencies in the record unfavorably to the plaintiff's position.

*Shanks v. Colvin*, No. CV 14-42, 2015 WL 5674872, at *6 (E.D. Ky. Aug. 31, 2015), *report and*

*recommendation adopted,* 2015 WL 5682350 (E.D. Ky. Sept. 25, 2015).  Further, "[a]n ALJ can

consider all the evidence without directly addressing in his written decision every piece of

evidence submitted by a party." *Loral Defense Systems–Akron v. N.L.R.B.,* 200 F.3d 436, 453

(6th Cir. 1999) (citations and internal quotation marks omitted).  *See also Conner v. Comm'r of*

*Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) ("[W]e do not require an ALJ to discuss every

piece of evidence in the record to substantiate the ALJ's decision."); *Thacker v. Comm'r of Soc.*

*Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in

the record for his decision to stand.").

  Here, plaintiff has not shown that the ALJ erred by engaging in a selective review of the

evidence.  The ALJ thoroughly considered the evidence of plaintiff's mental health symptoms

and limitations and resolved the conflicts in the evidence.  The ALJ fashioned an RFC that

included restrictions to account for plaintiff's mental health symptoms, including restrictions to

simple and routine tasks in a work environment free of fast production rate or pace work and

with only occasional changes in the work setting; occasional decision making; and no contact

with the public, only occasional contact with supervisors, and occasional and superficial contact

with co-workers.  (Tr. 26).  The evidence substantiates plaintiff's claim that he suffers from severe mental impairments and symptoms, but the evidence does not suffice to demonstrate that the ALJ erred in evaluating his claim of disability.  The Court must defer to the ALJ's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

Plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT:**

The Commissioner's decision be **AFFIRMED** and this matter be closed on the Court's docket.

Date:  __5/18/2020_____

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

STEVE HUTCHINSON,                    Case No. 1:18-cv-761
      Plaintiff,                    Cole, J.
                                  Litkovitz, M.J.

      vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).